**In re Jeffrey Allen THOMPSON, a minor child.**

**Pamela Kay White, Petitioner/Appellant,**

v.

**Patricia Teresa Thompson, Respondent/Appellee,**

and

**Debbie Coke & Donald Dooley, Plaintiffs/Counter– Defts./Appellees,**

v.

**Mary Helen Looper, Defendant/Counter– Pltf./Appellant.**

Court of Appeals of Tennessee, at Jackson.

Sept. 27, 1999.

Application for Permission to Appeal Denied by Supreme Court Jan. 24, 2000.

---

Susan MacKenzie, Memphis, for Appellants.

Deborah L. Pagan, David R. Huggins, The National Legal Foundation, Memphis, for Teresa Thompson.

Debbie L. Coke, Memphis, pro se.

Stephen M. Crampton, Michael J. De-Primo, American Family Association Law Center, Tupelo, MS, for Amicus Curiae, American Family Association, Inc.

Abby R. Rubenfeld, and Rubenfeld & Associates, Shannon Minter, National Center For Lesbian Rights, San Francisco, CA, for Amici Curiae, The National Center for Lesbian Rights, The American Civil Liberties Union of Tennessee, Tennessee National Organization for Women, Memphis National Organization for Women, LAMBDA Legal Defense and Education Fund, Inc., and NOW Legal Defense and Education Fund.

HIGHERS, Judge.

This consolidated appeal stems from two separate cases, each involving a nonparent's claim to visitation where the nonparent and the child's biological mother previously maintained a same-sex relationship and where the nonparent previously provided care and support to the child. In *White v. Thompson*, Patricia Teresa Thompson is the biological mother to a

son, who will be hereafter referred to by his first and last initials, "J.T.," and Pamela Kay White is the nonparent who previously provided care and support to J.T. White commenced the action by filing a Petition for Visitation, which was ultimately dismissed by the trial court. In *Coke v. Looper*, Debbie Coke is the biological mother to a daughter, who will hereafter be designated by her first and last initials, "J.C.," Donald Dooley is the biological father to J.C., and Mary Helen Looper is the nonparent who previously provided care and support to J.C. Although Coke and Dooley originally commenced the action by filing a "Complaint for Permanent Restraining Order and for Damages," Looper filed a "counter-complaint" that asserted, among other things, visitation rights. This claim to visitation was ultimately dismissed by the trial court, and Coke's and Dooley's claims were voluntarily nonsuited. On appeal, White's and Looper's jointly filed brief states the following:

> There is a single issue presented for review in this consolidated appeal: Whether a petition for visitation may be brought by a woman who, in the context of a long-term relationship, planned for, participated in the conception and birth of, provided financial assistance for, and until foreclosed from doing so by the biological mother, acted as a parent to the child ultimately borne by her partner.

Based upon the following, we affirm the trial court in each case.

### FACTS AND PROCEDURAL HISTORY

#### I. *White v. Thompson*

On June 20, 1996, White filed a "Petition for Visitation" against Thompson in the Shelby County Circuit Court. In the petition, White alleged that she and Thompson "were involved in a committed intimate relationship beginning in 1987," and that "[t]hroughout the course of the relationship the parties discussed having a child together." According to White's petition, Thompson successfully underwent artificial insemination on November 2, 1992, and White contributed to Thompson's support both during and after Thompson's pregnancy. Thompson's son, J.T., was born July 10, 1993. J.T.'s first name was based upon White's brother, and his middle name was based upon Thompson's father. After J.T.'s birth, both Thompson and White provided care and support to J.T. In June of 1994, however, the relationship between Thompson and White ended, and they ceased living together in August 1994. After the termination of these parties' relationship, however, White continued to provide care and support to J.T. until Thompson began "to interfere with [White's] relationship with the minor child by refusing and/or interfering with visitation and denying [White] the opportunity to talk with the minor child on the telephone." White's petition seeking visitation alleged, "It is in the best interest of the minor child ... that [White] have regular and ongoing visitation with the minor child."

On October 4, 1996, Thompson filed a response to White's Petition for Visitation, wherein she asserted that White "lacks standing to assert visitation rights." She further asserted that White had not alleged any threat of substantial harm to J.T. so as to overcome Thompson's constitutionally protected parental rights.[1] As such, on November 7, 1996, Thompson filed a motion to dismiss White's petition. White thereafter responded to Thompson's motion to dismiss, asserting, among other things, that she had stood *in loco parentis* to the minor child, and that she therefore had standing to assert a claim to visitation.

---

1. The allegations set forth in White's petition did imply that the separation between White and J.T. (*i.e.,* the failure to maintain White's and J.T.'s relationship) was causing and would cause harm to J.T. As set forth hereaf- ter, however, our resolution of the instant appeal does not reach this issue, and we find it unnecessary to resolve whether White's allegation of harm was sufficient to overcome Thompson's constitutional parental rights.

Ultimately, on January 9, 1998, the trial court entered an order which granted Thompson's motion to dismiss and which stated, in part, the following:

> In light of the Court's ruling, the Court will not address the "best interest of the child" argument. [Furthermore], the Court declines to address the "substantial harm" question.
>
> . . . .
>
> The Court ... finds that [White] lacks standing to bring the Petition for Visitation. . . .
>
> . . . .
>
> The Court finds that the doctrine *in loco parentis* does not give [White] standing to seek visitation.
>
> . . . .
>
> The Court finds overall that the relief requested by [White] is not a part of this Court's inherent jurisdiction. Unless or until the Tennessee Legislature creates jurisdiction by statute, this Court has no power to act on the instant Petition.
>
> For all of the above reasons, this Court determined that the Petition failed to state a claim upon which relief could be granted and to [sic] therefore dismissed.

Thereafter, White appealed.

## II. Coke (and Dooley) v. Looper

On August 15, 1996, Coke and Dooley jointly filed a "Complaint for Permanent Restraining Order and for Damages" against Looper in the Shelby County Chancery Court. Thereafter Looper filed an "Answer and Counter Complaint for Breach of Contract, Permanent Restraining Order and for Damages." Looper's answer admitted that Coke and Dooley are the natural parents of J.C., who was born September 18, 1992, and that J.C. had been legitimated by order of the Shelby County Juvenile Court on July 30, 1996.

In Looper's counter-complaint, she alleged that J.C. "was born as the result of artificial insemination after two years of joint efforts by ... Coke and ... Looper to produce a child that they would raise together. . . ." According to Looper's counter-complaint, on April 30, 1993, Coke and Looper entered a "co-parenting agreement," which provided in part the following:

> 3. Each party acknowledges and agrees that both parties will share in providing [J.C.] with the necessary food, clothing, shelter, medical or any other remedial care that may be needed by the child until the time [J.C.] is 18 years of age."
>
> . . .
>
> 7. Each party acknowledges and agrees that if Debbie Lynn Coke and Mary Helen Looper are no longer living together in the family home they will both continue to provide for [J.C.] in the manner described below:
>
> a. Legal custody of the child would remain in the biological parent, Debbie Lynn Coke;
>
> b. Mary Helen Looper would have reasonable visitation;
>
> c. Mary Helen Looper would have no financial obligations to [J.C.];
>
> . . .
>
> 9. Each party acknowledges and understands that there are legal questions raised by the issues involved in this AGREEMENT which have not been settled by statute or case precedent. Notwithstanding the knowledge that certain of the clauses stated herein may not be enforceable in a court of law, the parties choose to enter into this AGREEMENT and clarify their intent to jointly provide and nurture [J.C.], even in the event that they are no longer living together in the family home.

Looper's counter-complaint further alleged that Looper and Coke ceased living to-

gether in December 1995, and that these parties voluntarily implemented a visitation arrangement that was followed each week until Coke and Dooley commenced this action. Looper's counter-complaint sought damages based upon breach of contract and tort claims. Looper's counter-complaint also requested, however, that Coke and Dooley "be permanently enjoined from interfering with [Looper's] relationship and visitation with the minor child and establish a visitation schedule."

On March 24, 1997, Dooley individually filed a motion for judgment on the pleadings pursuant to Rule 12.03 of the Tennessee Rules of Civil Procedure, wherein he asserted that Looper had failed to allege any actions by Dooley that would support any breach of contract or tort claim against him. Dooley further asserted that Looper failed "to state any legally cognizable interest ... as to the minor child, who is not the child of [Looper] either by blood or adoption, such as would support a claim for rights to the child or for visitation with such child." On November 7, 1997, Coke filed a separate motion to dismiss, which sought dismissal of Looper's claims as against Coke.

After a November 14, 1997 hearing, the chancery court entered an order providing "That the Motion for Judgment on the Pleadings as to the Counter–Complaint against Donald Dooley is hereby granted, and the Counter–Complaint filed by Mary Helen Looper against Donald Dooley is hereby dismissed, with prejudice." (III R. at 64.) The chancery court also entered a separate order that provided, "The Motion to Dismiss filed by ... Coke is granted as to ... Looper's claim for visitation...." This order reflected the following statements made by the chancellor at the November 14, 1997 hearing:

> But insofar as Ms. Looper is concerned, especially with Ms. Coke, the natural mother, objecting to her visitation, it's this Court's ruling that Ms. Looper just has no claim or interest in that child and the Court so rules.

> ....

> The Court is ruling that Ms. Looper has no interest in this child—no claim on visitation legally, of course. .... I'm saying that she has no interest in the child that's enforceable under law.

Thereafter, the chancery court entered two separate orders of voluntary nonsuit that dismissed both Coke's and Dooley's claims against Looper. Though Looper's breach of contract and tort claims for damages against Coke were not resolved at this point, the trial court's second order of dismissal declared that its judgment was final under the provisions of Rule 54.02 of the Tennessee Rules of Civil Procedure. As such, Looper appealed.

As stated earlier, White's and Looper's jointly filed brief in this consolidated appeal states the following for appeal:

> There is a single issue presented for review in this consolidated appeal: Whether a petition for visitation may be brought by a woman who, in the context of a long-term relationship, planned for, participated in the conception and birth of, provided financial assistance for, and until foreclosed from doing so by the biological mother, acted as a parent to the child ultimately borne by her partner.

### ANALYSIS

■ We find it appropriate to begin our analysis by reviewing the meaning of the term "parent" under Tennessee law. Title 36 of our state's statutory code, titled "Domestic Relations," includes six separate chapters that govern: (1) adoption; (2) paternity; (3) marriage; (4) divorce and annulment; (5) alimony and child support; and (6) child custody and visitation. Tennessee Code Annotated section 36–1–102 defines the terms "legal parent" and "parent," and, while the terms of this statute make these definitions expressly applicable only to part 1 of chapter 1 in title 36 (*i.e.,* sections 36–1–101 *et seq.,* which set

forth general provision relating to adoption), "[s]tatutes 'in pari materia'—those relating to the same subject or having a common purpose—are to be construed together." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn.1995). Accordingly, we find that section 36–1–102 provides guidance as to the legislature's meaning of the term "parent." Section 36–1–102(26) states that a "legal parent" may be any of the following:

(A) The biological mother of a child;

(B) A man who is or has been married[2] to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;

(C) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;

(D) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to §§ 24–7–118, 68–3–203(g), 68–3–302 and 68–3–305(b), an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or

(E) An adoptive parent of a child or adult.

TENN.CODE ANN. 36–1–102(26) (Supp.1998). Moreover, section 36–1–102(34) provides a somewhat similar, but broader definition of the looser term "parent" by stating: " 'Parent(s)' means any biological, legal, adoptive parent(s) or, for purpose of §§ 36–1–127—36–1–141, stepparents." *Id.* § 36–1–102(34). In the consolidated cases before this Court, neither White nor Looper is a parent as is contemplated by our legislature, despite each parties' characterizations whereby each refers to herself as a "parent" of the child. While it *may* be true that in our society the term "parent" has become used *at times* to describe more loosely a person who shares mutual love and affection with a child and who supplies care and support to the child, we find it inappropriate to legislate judicially such a broad definition of the term "parent" as relating to legal rights relating to child custody and/or visitation. Just as a grandparent who provides care and support to a child does not become recognized as being a parent (absent adoption) under Tennes-

---

**2.** We find it relevant to note that, while neither White nor Looper were married to the biological mother in their respective cases, they also could not have been married to the biological mother under Tennessee law. Tennessee Code Annotated § 36–3–113, titled "Marriage between one (1) man and one (1) woman only legally recognized marital contract," provides the following:

(a) Tennessee's marriage licensing laws reinforce, carry forward, and make explicit the long-standing public policy of this state to recognize the family as essential to social and economic order and the common good and as the fundamental building block of our society. To that end, it is further the public policy of this state that the historical institution and legal contract solemnizing the relationship of one (1) man and one (1) woman shall be the only legally recognized marital contract in this state in order to provide the unique and exclusive rights and privileges to marriage.

(b) The legal union in matrimony of only one (1) man and one (1) woman shall be the only recognized marriage in this state.

(c) Any policy, law or judicial interpretation that purports to define marriage as anything other than the historical institution and legal contract between one (1) man and one (1) woman is contrary to the public policy of Tennessee.

(d) If another state or foreign jurisdiction issues a license for persons to marry which marriages are prohibited in this state, any such marriage shall be void and unenforceable in this state.

TENN.CODE ANN. § 36–3–113 (1996).

see law, other persons are not recognized as being a parent under Tennessee law based *only* upon prior care and support of a child. These other persons include any unmarried persons who maintain a close intimate relationship with a child's natural parent, whether they are of the same or opposite sex of that natural parent.

 In the absence of some statutory right or proceeding to the contrary, our state legislature has expressly given parents, whether they are biological parents or adoptive parents, the statutory right of custody and control of their minor children.

> (a) Parents are the joint natural guardians of their minor children, and are equally and jointly charged with their care, nurture, welfare, education and support and also with the care, management and expenditure of their estates. Each parent has equal powers, rights and duties with respect to the custody of each of their minor children and the control of the services and earnings of each minor child. . . .
>
> . . . .
>
> (c) If either parent dies or is incapable of acting, the guardianship of each minor child shall devolve upon the other parent.

TENN.CODE ANN. § 34–11–102 (1996). As one court from another jurisdiction correctly observed, "To allow the courts to award visitation—a limited form of custody—to a third person would necessarily impair the parents' right to custody and control." *Alison D. v. Virginia M.*, 77 N.Y.2d 651, 569 N.Y.S.2d 586, 572 N.E.2d 27, 29 (1991). Accordingly, we conclude that, based upon the statutory right of parents to custody and control of their minor children, Tennessee law does not provide for any award of custody or visitation to a nonparent *except as may be otherwise provided by our legislature.*[3] In the cases before this Court, neither White's nor Looper's claim to visitation was asserted pursuant to any such statutory right or proceeding. Accordingly, as these cases are presented to this Court, the trial court in each case was correct in dismissing the nonparent's claim based upon lack of standing to assert such claims.[4]

We are mindful that certain prior Tennessee cases have broadly stated that chancery courts[5] have inherent *jurisdiction,* extending beyond their statutory jurisdiction, to act in relation to property and other interests of minors. *See Stambaugh v. Price,* 532 S.W.2d 929, 932 (Tenn.1976); *Cummings v. Patterson,* 54 Tenn.App. 75, 388 S.W.2d 157, 165 (1964); *Smartt v. Smartt,* 1 Tenn.App. 68 (1925); *Carter v. Carter,* 144 Tenn. 628, 234 S.W. 764 (Tenn. 1920). These prior cases, however, do not alter our conclusion, as each such case is either distinguishable or is not controlling precedent. We begin by noting that each such case was actually rendered *after* our legislature had already afforded chancery courts such generalized subject matter jurisdiction. As far back as 1858, our legislature had already statutorily provided that chancery courts have subject matter juris-

---

**3.** Aside from other statutory proceedings affecting the right of parents to custody and control of their minor children, our legislature has, in fact, promulgated legislation specifically relating to certain nonparents' rights to visitation. *See* TENN.CODE ANN. §§ 36–6–301 *et seq.*

**4.** It should be noted, however, that we find it unnecessary to express any opinion as to whether public policy would preclude the specific performance of visitation set forth in a co-parenting agreement, as was executed in the *Coke v. Looper* case, because the parties on appeal have not addressed whether a co-parenting agreement can provide a right to visitation and standing to assert such a claim. Moreover, had this issue been raised, we would find it unnecessary to resolve the same, as Dooley, who is J.C.'s biological father, was not a party to the co-parenting agreement.

**5.** As we noted earlier, the *Coke v. Looper* case was brought in chancery court, whereas the *White v. Thompson* case was brought in circuit court.

diction, concurrent with the county courts, of the persons and estates of infants. Tenn.Code § 4299 (1858). Such legislation still remains effective in our current code. *See* Tenn.Code Ann. § 16–11–109 (1994). Moreover, this Court has previously limited such "inherent jurisdiction" based upon other subsequent statutory provisions.[6] *See St. Peter's Orphan Asylum Assoc. v. Riley*, 43 Tenn.App. 683, 311 S.W.2d 336, 339–40 (1957).

In *Carter v. Carter*, the Tennessee Supreme Court first observed in a case involving the property of minors "that the jurisdiction of the chancery court does not [entirely] depend upon ... statute, but that the jurisdiction is inherent, and even more comprehensive than ... statute." *Carter*, 234 S.W. at 766. This original observation, which was made in 1920, was made at a time that preceded the legislature's enactment of the original statute establishing the statutory right of parents to the custody and control of their minor children, however. This statute, which was originally titled "Fathers and mother are joint and equal natural guardians of their minor children; and are equally charged with their support, etc.," was not enacted until 1923. *See* Shannon's Code § 4320a1 (Supp.1926). Accordingly, a parent's *statutory* right to custody and control of his or her children was not established at the time the Supreme Court originally addressed this matter, and we therefore conclude that *Carter* does not establish controlling precedent in the instant case.

In White's and Thompson's brief, they cite to and rely upon two more recent cases, *Cummings v. Patterson*, 54 Tenn. App. 75, 388 S.W.2d 157 (1964), and *Stambaugh v. Price*, 532 S.W.2d 929 (Tenn. 1979), which both stated that the chancery court's jurisdiction in relation to the property and other interests of minors is inherent and extends beyond its statutory jurisdiction. Neither of these cases involved the property or other interests of minors, however,[7] and we therefore deem such *dicta* not to be controlling, in light of the foregoing.

While we recognize that other jurisdictions that have been faced with the issue that is presently before this Court have reached differing results, with some seemingly contrary to our conclusion,[8] several such jurisdictions have reached a similar result to our conclusion. In *Kathleen C. v. Lisa W.*, 71 Cal.App.4th 524, 84 Cal. Rptr.2d 48 (1999), Kathleen C., who was a former lesbian partner of Lisa W., sought visitation rights with Lisa W.'s biological children based upon the contention that she was a *de facto* parent of the children. 84 Cal.Rptr.2d at 49. Though Lisa W. already had one three year old daughter when the parties began living together,

---

**6.** The statutory right of parents to the custody and control of their children was not enacted until 1923. *See* Shannon's Code § 4320a1 (Supp.1926).

**7.** *Cummings* involved the property of an incompetent, and held that chancery courts did not possess inherent jurisdiction of the persons or estates of lunatics or persons of unsound mind. 388 S.W.2d at 165. *Stambaugh* involved a challenge to the election of a candidate to the office of juvenile judge based upon the candidate's qualifications, and simply included a summary of a juvenile court's jurisdiction as contrasted to other courts. 532 S.W.2d at 932.

**8.** *See e.g. E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886 (1999) (holding that the trial court had equity jurisdiction to grant visitation between the child and the mother's for-

mer same-sex partner as the child's "de facto" parent); *V.C. v. M.J.B.*, 319 N.J.Super. 103, 725 A.2d 13 (App.Div.1999) (holding that, while mother's former same-sex partner was not entitled to custody of children, said partner was entitled to visitation); *J.A.L. v. E.P.H.*, 453 Pa.Super. 78, 682 A.2d 1314 (1996) (holding that, while mother's former same-sex partner stood *in loco parentis* with child and, therefore, had standing to seek partial custody of child); and *Holtzman v. Knott*, 193 Wis.2d 649, 533 N.W.2d 419 (1995) (holding that, while mother's former same-sex partner could not assert claim to custody or statutory claim to visitation, trial court may have equitable power to hear petition for visitation when it determines that petitioner has parent-like relationship with child).

Lisa W. also became pregnant by artificial insemination and had another child during the parties' relationship, and the parties gave the child Kathleen C.'s surname as a middle name. *Id.* Kathleen C. was regularly involved in the care and support of both children until the parties separated. The California Court of Appeal summarized that state's applicable law by stating the following:

> The courts of appeal have previously decided that a lesbian partner who is not a biological or adoptive parent is not entitled to custody of children conceived during a same sex bilateral relationship. In *Curiale v. Reagan* [222 Cal.App.3d 1597, 272 Cal. Rptr. 520 (1990)], the court held that a nonparent had no standing to assert a claim for custody or visitation as against a child's natural mother upon termination of the lesbian relationship. The court explained that "[j]urisdiction to adjudicate custody depends upon some proceeding properly before the court in which custody is at issue such as dissolution, guardianship, or dependency.... The Legislature has not conferred upon one in plaintiff's position, a nonparent in a same-sex bilateral relationship, any right of custody or visitation upon termination of the relationship." Similarly, the court in *West v. Superior Court* held that the courts have no jurisdiction to entertain the petition of a nonparent in a lesbian relationship for custody and visitation rights.[9] Finally, in *Nancy S. v. Michele G* (1991) 228 Cal.App.3d 831, 836, 279 Cal.Rptr. 212., Division One of this court held that a lesbian partner who was not the adoptive or biological parent of children conceived during a lesbian relationship was not entitled to seek custody or visitation of the children under the Uniform Parentage Act.

. . . .

Finally, [Kathleen C.] cannot prevail on her argument that she is entitled to visitation rights because she is a de facto parent of the children. The term, de facto parent, has its genesis in the juvenile dependency system and generally has been used to refer to foster parents caring for dependent children. . . . . As the California Supreme Court has explained, "[t]he de facto parenthood doctrine simply recognizes that persons who have provided a child with daily parental concern, affection, and care over substantial time may develop legitimate interests and perspectives, and may also present a custodial alternative, which should not be ignored *in a juvenile dependency proceeding.* The standing accorded de facto parents has no basis independent of these concerns." 84 Cal.Rptr.2d at 50 (citations omitted). Accordingly, the California Court of Appeal concluded that Kathleen C was not entitled to any relief, and that her claim to visitation would more appropriately be addressed to the Legislature. *Id.* at 49.

In *Titchenal v. Dexter,* 166 Vt. 373, 693 A.2d 682 (1997), Chris Titchenal and Diane Dexter were involved in an intimate same-sex relationship during which they decided to raise a child. 693 A.2d at 683. Though their attempts to conceive via a sperm donor failed, they jointly decided that Dexter would adopt a child. *Id.* A newborn baby was adopted by Dexter, and was given the last name "Dexter–Titchenal." *Id.* For several years, both parties provided care and support for the child. *Id.* Eventually, the parties' relationship ended, after which Titchenal "filed a complaint requesting that the superior court exercise its equitable jurisdiction to establish and enforce regular, unsupervised parent-child contact...." *Id.* Titchenal asserted, among other things, that the doctrines of

---

9. The court in *West v. Superior Court* also stated, "If the Legislature does not provide a person with standing to obtain parental rights, the courts must presume the Legislature is acting, or refusing to act, by virtue of its position as representatives of the will of the people." 59 Cal.App.4th 302, 69 Cal. Rptr.2d 160, 164 (1997).

in loco parentis and *de facto* parenthood allowed the court to exercise such equitable authority. *Id.* The Vermont Supreme Court, however, held, "absent statutory authority extending . . . jurisdiction to adjudicate third-party visitation requests, . . . legal parents retain the right to determine whether third-party visitation is in their children's best interest." *Id.* at 690.

In *Music v. Rachford*, 654 So.2d 1234 (Fla.Dist.Ct.App.1995), Brenda Music was involved in a lesbian relationship with Tara Rachford, during which the parties decided to raise a child together. 654 So.2d at 1234. As Music was unable to have a child, Rachford was artificially inseminated. *Id.* After birth of the child, the child was given Music's surname, and the parties cohabitated together for several years. *Id.* After the parties' relationship ended and Rachford terminated Music's access to the child, Music filed suit seeking shared parental responsibility and visitation. *Id.* at 1234–35. She based her claim upon the contention that she was a *de facto* parent of the child. *Id.* at 1235. The Florida District Court of Appeal, however, rejected her claim and cited prior Florida precedent for the proposition that "[v]isitation rights are, with regard to a non-parent, statutory, and the court has no inherent authority to award visitation." *Id.* (citing *Meeks v. Garner*, 598 So.2d 261 (Fla.Dist. Ct.App.1992)).

In *Alison D. v. Virginia M.*, 77 N.Y.2d 651, 569 N.Y.S.2d 586, 572 N.E.2d 27 (1991), Alison D. and Virginia M., while living together, decided to raise a child and that Virginia M. would be artificially inseminated. 569 N.Y.S.2d 586, 572 N.E.2d at 28. A child was thereafter born and given Alison D.'s surname as his middle name. *Id.* Afterwards, both parties jointly provided care and support to the child until the parties' relationship ended. *Id.* Though the parties initially agreed to certain specified visitation, Virginia M. eventually terminated all contact between Alison D. and the child. *Id.* Thereafter, Alison D. filed suit to obtain visitation rights, contending that she had standing to assert her claim because she acted as a *de facto* parent and/or she should be viewed as a parent "by estoppel." *Id.* at 29. The New York Court of Appeals, however, rejected Alison D.'s claims and determined that, because Alison D. was not a "parent" under New York's Domestic Relations Law, she "ha[d] no right . . . to seek visitation and, thereby, limit or diminish the right of the . . . parent to choose with whom her child associates." [10] *Id.* The court reasoned as follows:

> Where the Legislature deemed it appropriate, it gave other categories of persons standing to seek visitation and it gave the courts the power to determine whether an award of visitation would be in the child's best interests. . . . . While one may dispute in an individual

**10.** Subsequent New York cases have similarly held that, in the absence of a statutory proceeding, a nonparent lacks standing to seek visitation of a child. In *Lynda A.H. v. Diane T.O.*, 243 A.D.2d 24, 673 N.Y.S.2d 989 (1998), Diane T.O and Lynda A.H. decided to raise a child and that Lynda A.H. would be artificially inseminated. 673 N.Y.S.2d at 990. The child was given Diane T.O.'s last name as her middle name, and both parties provided care and support in rearing the child. *Id.* After the parties' relationship ended, Diane T.O. sought custody and/or visitation with the child. *Id.* After the New York Supreme Court, Appellate Division, first disposed of the issue of custody (ruling against Diane T.O.), the court held that Diane T.O., who was neither a biological nor adoptive parent, lacked

standing to seek visitation of the child. *Id.* at 991.

Similarly, in *Bessette v. Saratoga County Comm'r of Soc.Servs.*, 209 A.D.2d 838, 619 N.Y.S.2d 359 (1994), former foster parents sought visitation because they had established "significant and long-term parental-like relations with foster children." 619 N.Y.S.2d at 359. On appeal, the New York Supreme Court, Appellate Division, noted that there is no New York statute which expressly gives former foster parents the right to maintain a proceeding for visitation. *Id.* The court held, "that, in the absence of any statutory grant of standing to former foster parents, [such persons] have no right to seek visitation. . . ." *Id.* at 360.

case whether it would be beneficial to a child to have continued contact with a nonparent, the Legislature did not ... give such nonparent the opportunity to compel a fit parent to allow them to do so.

*Id.* (citations omitted).

Our conclusion in the instant case is consistent with those cases discussed immediately above. While Tennessee's legislature has generally conferred upon parents the right of custody and control of their children, it has not conferred upon one in either White's or Looper's position (a nonparent who is not and has not been married to either of the children's parents, but who previously maintained an intimate relationship with such a parent and who previously provided care and support to the children) any right of visitation. *Cf. Kathleen C.,* 84 Cal.Rptr.2d at 50. Absent statutory authority establishing such a third-party's right to visitation, parents retain the right to determine with whom their children associate. *Cf. Titchenal,* 693 A.2d at 690; *Alison D.,* 569 N.Y.S.2d 586, 572 N.E.2d at 29. Accordingly, both White and Looper lacked standing to assert their claims to visitation, and the trial courts were correct in dismissing the same.

In White's and Looper's jointly filed brief, they assert that Thompson, Coke, and Dooley should be equitably estopped from denying White and Looper visitation. In support of this proposition, they cite to and rely upon several prior Tennessee cases involving the rights and/or obligations of prior stepfathers who had been married to the such child's natural mother. These cases, however, are premised, in part, upon the effect that the mother's and stepfather's marital union had upon the parties' legal rights and obligations, and the instant cases involve no such prior marital union. Accordingly, we are unpersuaded by White's and Looper's argument, and deem it appropriate to leave these matters (White's and Looper's right to visitation) to the legislature.

■ Lastly, White's and Looper's jointly filed brief further asserts that, regardless of any rights afforded under Tennessee statutes and/or case law, they possess a constitutionally protected right to seek and acquire visitation. This argument is premised upon the assertion that they acted as *de facto* parents and thereby acquired constitutionally protected parental rights. While we recognize that both White and Looper possessed certain constitutional privacy rights during their relationships with Thompson and Coke, respectively, we are unaware of and have not been cited to any prior controlling precedent that has utilized the concept of either *de facto* parenthood and/or *in loco parentis* to extend constitutional parental rights, including the right to visitation, to unmarried/unrelated persons in White's and/or Looper's position. We therefore summarily reject White's and Looper's assertion and reliance upon a constitutional parental right to visitation, and any other constitutional right which would otherwise be based upon the existence of such a constitutional parental right.

### CONCLUSION

In accordance with the foregoing, we hereby affirm the trial court's dismissal of the asserted claims to visitation in both *White v. Thompson* and *Coke v. Looper.* Costs on appeal are taxed to White and Looper, for which execution may issue if necessary.

CRAWFORD, P.J., W.S., and FARMER, J., concur.